WRIGHT, FINLAY & ZAK, LLP
Charles C. McKenna, Esq.
California Bar No. 167169 (*PHV petition* forthcoming)
Lukasz I. Wozniak, Esq.
Nevada Bar No. 12139
Yanxiong Li, Esq.
Nevada Bar No. 12807
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 475-7964; Fax: (702) 946-1345
cmckenna@wrightlegal.net
lwozniak@wrightlegal.net
yli@wrightlegal.net
*Attorneys for Plaintiff, Kaiqing Yang*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| Kaiqing Yang,<br><br>          Plaintiff,<br>     vs.<br><br>Andrew S. Fonfa; William Weidner; David Jacoby; Sahara Investments, LLC; Las Vegas Economic Impact Regional Center, LLC; Eastern Investments, LLC; BOFU, LLC; Weidner Management, LLC, Does 1 through 100, inclusive, Roe Entities 1 through 100,<br><br>          Defendants. | Case No.: 2:20-cv-1518<br><br>**COMPLAINT FOR BREACH OF REFUND POLICY**<br><br>**[DEMAND FOR JURY TRIAL]** |

        COMES NOW, Ms. Kaiqing Yang (hereafter as "Plaintiff"), by and through her attorneys of record, the law firm of Wright, Finlay & Zak, LLP, complains and alleges as follows:

///

///

///

///

**Preliminary Statement**

1.     Between 2013 and 2017, Defendants perpetuated a large scale investment scheme to exploit a federal immigrant visa program[1] as a means to defraud investors seeking strong returns and a legal path to permanent U.S. residency.  Through this scheme, Defendants fraudulently sold over $89 million in securities and collected an additional $8.95 million in administrative fees from over 175 investors.  These investors (including Plaintiff) were duped on the basis of false and misleading information and promises supplied by Defendants.

2.     Central to their fraudulent scheme is a detailed refund policy set forth in Defendants' January 15, 2013 Investment Summary, used to assure Plaintiff and similarly situated investors a low risk opportunity to qualify for an EB-5 visa – *i.e.* a chance to set foot on U.S. soil and get their *conditional* green card.  Under this refund policy, signed and reaffirmed by all Individual Defendants, Plaintiff is entitled to a refund of the entire capital investment ($500,000) plus at least a portion of the administrative fee (up to $50,000).

3.     Despite this plain and unambiguous refund policy, Defendants has refused or otherwise failed to respond to Plaintiff's request for refund.  On information and belief, Defendants prematurely dissipated all of the investments, including $550,000 invested by Plaintiff, although the majority of investors have yet to obtain their EB-5 visa.  Plaintiff is further informed and believes that some of these funds were directed to Individual Defendants' personal, familial and/or business accounts to benefit Individual Defendants' other businesses and/or personal gain.

///

///

---

[1] The Immigration and Nationality Act of 1990 provided a method for foreign nationals to obtain permanent U.S. residency by investing in domestic projects that will create or preserve a minimum number of jobs for U.S. workers.  Known colloquially as the "EB-5 Program" and administered by U.S. Citizenship and Immigration Services (or "USCIS"), this program provides that foreign nationals may qualify to obtain a green card if the individuals invest $1,000,000 (or at least $500,000 in a "Targeted Employment Area" i.e., a high unemployment or rural area), creating or preserving at least 10 jobs for U.S. workers, excluding the investor and his or her immediate family.

## Parties

*Defendants*

4.    Andrew S. Fonfa ("Fonfa") is resident of Clark County, Nevada.

5.    William P. Weidner ("Weidner") is resident of Clark County, Nevada.

6.    David Jacoby ("Jacoby") is resident of Clark County, Nevada.    Together with Fonfa and Weidner, will hereafter be collectively referred to as "Individual Defendants."

7.    Las Vegas Economic Impact Regional Center, LLC ("LVEIRC") is a Nevada limited liability company, formed August 30, 2011, with its principal offices at 2117 Paradise Rd., Las Vegas, NV and 8240 W. Charleston Blvd., Las Vegas, NV.  Both Fonfa and Weidner co-manage LVEIRC through their wholly-owned and/or controlled holding companies (see organizational chart below) and Jacoby is LVEIRC's Managing Director.  Fonfa, Weidner and Jacoby are agents of LVEIRC.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

**Organizational Chart for LVEIRC**

8.    Eastern Investments, LLC ("Eastern") is a Nevada limited liability company, formed August 25, 2011, with its principal offices at 2117 Paradise Rd., Las Vegas, NV.  Fonfa is the sole managing member of Eastern.  Fonfa is its agent.  Eastern was an alter ego of Fonfa in that Fonfa was its sole managing member;  Eastern accounts commingled assets of Fonfa, his other businesses,  and personal accounts related to Fonfa's family, and Fonfa used Eastern to carry out the scheme alleged herein.

9.    BOFU, LLC ("Bofu") is a Nevada limited liability company, formed May 19, 2010, with its principal offices at 8240 W. Charleston Blvd., Las Vegas, NV.  Weidner manages Bofu through WM (defined below).  Weidner is a controlling stakeholder in Bofu.  Weidner is its agent.  Bofu was an alter ego of Weidner in that Weidner materially participated or influenced its management; controlled its affairs;  Bofu's accounts commingled assets of Weidner,  his other businesses,  personal accounts related to Weidner's family, and Weidner used Bofu to carry out the scheme alleged herein.

10.    Weidner Management, LLC ("WM") is a Nevada limited liability company, formed November 20, 2012, with its principal offices at 9711 Orient Express Court, Las Vegas, NV.  Weidner manages the WM with the help of this son, James Weidner, and is its statutory agent.  Weidner is a controlling stakeholder in WM.  Weidner is its agent.  WM was also an alter ego of Weidner (like Bofu) in that Weidner materially participated or influenced its management;  controlled its affairs;  WM's accounts commingled assets of Weidner,  his other businesses, and personal accounts related to Weidner's family; and Weidner used WM to carry out the scheme alleged herein.

11.    Sahara Investments, LLC ("Sahara") was a Nevada limited liability company, formed October 23, 2006, with its principal offices at 200 W. Sahara Ave., 4001, Las Vegas, NV at the time of its dissolution.  Sahara filed for dissolution on October 18, 2019.  Both Weidner and Fonfa managed and controlled Sahara.  Both were its agents.  Sahara was an alter ego of Weidner and Fonfa in that they were the sole managers of that entity;  Sahara accounts commingled assets of Weidner and Fonfa,  their other businesses,  personal accounts related to their families, and they used Sahara to carry out the scheme alleged herein.

12.     On information and belief, each Defendant was the agent and/or employee of the other Defendants and each of them, and in doing the things herein alleged was acting within the course and scope of such agency and employment and with the permission and consent of the other Defendants, and each of them.

13.     On information and belief, each of the Individual Defendants who were or are the owners or managers of the entity defendants was and is the alter ego of the said entity defendants through which they perpetuated the unlawful and wrongful conduct alleged herein.

14.      The true names and capacities, whether individual, corporate, or otherwise, of Defendants sued herein as Does 1 through 100 and Roe entities 1 through 100, inclusive, are currently unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated as a Doe is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiff will seek leave of court to amend her Complaint to reflect the true names and capacities of the Defendants designated herein as Does when such identities become known.

***Plaintiff***

15.     Kaiqing Yang is a resident of Shenzhen, China.  Based on the false claims and promises alleged herein by Defendants, Ms. Yang invested $500,000 in capital and $50,000 in "administrative costs" with Defendants in or around November 2015.  Prior to obtaining her I-526 approval, Ms. Yang withdrew her I-526 petition and submitted a written refund request to Defendants pursuant to Defendants' refund policy.  Defendants refused or otherwise failed to refund her investments in the project.

///
///
///
///
///
///
///

**JURISDICTION AND VENUE**

16.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as all Plaintiff and all Defendants are "citizen[s] of a different State" and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.    Additionally, the Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. §78aa and 28 U.S.C. § 1331 as to Plaintiff's action arises under 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) (1)-(2) because Defendants reside or are domiciled in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**GENERAL ALLEGATIONS**

*Relevant Background of EB-5 Investment*

19.    Between 2004 and 2011, Fonfa purchased multiple parcels of vacant land on which he would later develop a luxury condominium project known as Allure Towers.

20.    After completing the first of the two planned towers, the real estate and mortgage markets suffered the worst recession since the Great Depression.

21.    Plans for the second tower were cancelled as units in the first tower either remained unsold or were subject to rescinded contracts of purchase.

22.    As a result, Fonfa, through various entities, held a 2.51 acre vacant parcel (originally dedicated to building the second Allure tower) located in the relatively secluded northern sector of the Las Vegas Strip.

23.    To fill this void, Fonfa set out to develop and construct the Lucky Dragon Hotel & Casino (the "Project") as the first casino resort in Las Vegas, Nevada, catering exclusively to an Asian cultural and gaming experience.

24.    The Project was funded using funds invested *via* the federal EB-5 Program from 179 foreign Investors, including the Plaintiff in this action.

///
///

25.     Under the EB-5 Program, administered by the United States Customs and Immigration Service ("USCIS"), foreign investors may obtain conditional/permanent residency status (and eventually U.S. citizenship) by committing to invest and investing a certain sum of money in job-creating enterprises.

26.     The application process is generally divided into several stages: (see flowchart on next page) first, the applicant applies for eligibility to participate in the program using the I-526 petition; second, the applicant applies for his/her EB-5 visa using either a I-485 petition or a DS-260, depending on whether the applicant is already in the U.S. based on a separate visa/residency program; third, the applicant applies for removal of the condition on his/her conditional green card using the I-829 petition.

27.     After the immigrant investor obtains his/her conditional green card (i.e. approval of I-485/DS-260), his/her investment must be invested or be subjected to the possibility of loss in order to create and maintain 10 full-time jobs during the course of a two-year period.

28.     Because the immigrant investors' money need not be placed at risk of loss before issuance of the conditional green card, project sponsors commonly offer a refund policy that covers the period leading up to issuance of the EB-5 visa/conditional green card as Defendants did in this case (see detailed refund policy below).

///
///
///
///
///
///
///
///
///
///
///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Regional Center: EB-5 Immigrant Investor Timeline/Flowchart

Choose Regional Center

Document Lawful Source of Funds → Invest Requisite Amount of Money → File EB-5 Petition Package (Form I-526) with USCIS

Await Approval (Estimate: 16 months or more)

If investor born in China, multiple year quota wait before proceed to next step

If in the United States
File Form I-485 (Adjustment of Status)

If not in the United States
File Form DS-260 at National Visa Center

Await Approval (Estimate: 6 to 8 Months)

Await Interview (Estimate: 6-12 Months)

Receive Conditional Permanent Resident Status Approval (2 year green card)

(21 to 24 months later)
File Petition to Remove Conditions on Residence (Form I-829)

(Estimate: 18 to 24 months later)
Receive Permanent Green Card

(5 years after conditional green card)
File Application for Naturalization

(Estimate: 6 to 12 months)
Approved for Naturalization (U.S. citizenship)

***Defendants' Offering Materials***

29.    In or around late 2012/early 2013, Defendants retained non-party Lianhong Overseas Consultants Limited, an immigration brokerage company headquartered in Shenzhen, China, to aid Defendants with raising capital from retail investors seeking a pathway to U.S. residency.

30.    LVEIRC also maintained a sales office located in Shanghai, China staffed by Danni Wang.

31.    As part of the offering materials provided by Defendants to Lianhong, Individual Defendants prepared and submitted to Lianhong an Investment Summary and Offering Memorandum.

32.    On information and belief, Defendants were introduced to Lianhong's principal, Rachel Zou, by LVEIRC's immigration counsel Linda Lau, Esq. of Global Law Group, which prepared and filed LVEIRC's I-924 petition to be recognized as a Regional Center.

33.    In early 2013, Lianhong and/or Ms. Lau hired Ms. Feng JiaJia and her law firm, Guangdong Junhou Law Firm fka Guangdong King and Land Law Firm ("Junhou"), to produce Chinese translations of the offering materials supplied by Defendants to Lianhong.

34.    Junhou's work resulted in a 434-page Subscription Agreement Booklet dated February 2013 including both English duplicates and Chinese translations of offering materials and contracts (e.g. Investment Summary at p.18-29; Duvardo Appraisal at p.82-87; and Private Offering Memorandum at p.170-236).

35.    The LVEIRC Private Offering Memorandum, approved 6/5/12 (the "Offering Memorandum") offers to sell 230 limited partner interests (the "Interests") in Lucky Dragon, LP, to foreign investors for $500,000 each plus a $50,000 administrative fee. Each Interest constitutes 0.434% of the ownership of the limited partnership. The purpose of the offering is to raise $115 million to help fund Individual Defendants' project, *i.e.,* "the acquisition of land, development and operation of [hotel and casino] designed to create an authentic Asian cultural and gaming experience."

36.    In addition to the $115 million of anticipated total investments, the Offering Memorandum states that Individual Defendants, Fonfa and Weidner, will raise additional funding for the project through their own contribution of a 10,000 square feet parcel of land adjacent to the project's development site, currently owned by them through Lucky Dragon Property, LLC, a Nevada limited liability company.

37.    The project holds out the prospect that if it successfully creates or saves at least ten jobs per investor, then each foreign investor in the project offering could receive permanent residency in the U.S. pursuant to the EB-5 Program.

38.    The Offering Memorandum expressly offers to sell "securities in a private placement" to "investors."  The Offering Memorandum explains that the interests are offered and sold to Qualified Investors in reliance on an exemption from registration under the Securities Act.

39.    The Offering Memorandum identifies the LP as the "offeror" of securities. It also identifies LVEIRC as the "sponsor" of the project that is the object of the securities offering.

40.    Investments began in in late 2012/early 2013 pursuant to the Offering Memorandum.

41.    While the Defendants may have dated each investors' Offering Memorandum with a different date, for purposes of this Complaint, statements and promises are based on the USCIS-approved versions of the offering materials summarized and indexed on pages 9 and 10 of the Investment Summary:

    a.  USCIS Approved Subscription Agreement and Accredited Investor Questionnaire (based on USCIS approved 3/10/2012 version);

    b.  USCIS Approved Confidential Private Offering Memorandum (based on USCIS approved 6/5/2012 version);

    c.  USCIS Approved Comprehensive Business Plan (based on USCIS approved 6/2012 version);

    d.  USCIS Approved Economic Impact Analysis (based on USCIS approved 5/31/2012 version).

42.    The Investment Summary and above offering materials were included as exhibits with most I-526 applications that the investors filed with USCIS.

43.    More recently, on September 2, 2015, Jacoby authored a letter to investors reaffirming the applicability of Section 2.8 of the Investment Summary as containing the detailed Refund Policy.

44.    Jacoby is identified in the Offering Memorandum as (1) the contact person on the cover page, (2) the person to contact with questions or to secure more information, and (3) the person to contact for access to information concerning the offering and to handle inquiries from investors or their representatives.

45.    Individual Defendants have also provided the Offering Memorandum to one or more foreign sales agents (e.g. Lianhong; Danni Wang); made presentations regarding the offering to investors in China; communicated with representatives of hotel chains; and had signing authority over the bank accounts from which over tens of millions of dollars in reserves for refund were misappropriated.

46.    Accordingly, Individual Defendants had ultimate authority when making the materially false and misleading misstatements in the Offering Memorandum, and he, along with managers of LVEIRC, are the makers of the false or misleading statements contained in the Offering Memorandum.

***Offering Materials' False Statements and Promises***

**Refund Policy**

47.    The Investment Summary prominently features a detailed refund policy that covers the investment period all the way through the decision on each investor's EB-5 visa (not just I-526) application: (excerpt of the detailed Refund Policy on next page):

///

///

///

///

///

Investment Summary

(1) When the investor's I-526 petition is denied, his/her capital contribution and processing fee shall be refunded in the following manner:

a) If the I-526 petition denial is due to factors within the investor's control:

If the investor withdraws the I-526 petition, provides false data/information, fails to perform in accordance with the subscription agreement, or refuses to cooperate in the filing and handling of the I-526 petition in such a way as to result in the withdrawal or denial of the I-526 petition, the Project will refund the US$ 500,000 capital investment to the investor, and will refund US$ 42,500 of the processing fee (after deducting US$ 7,500) to the investor for a total refund of US$ 542,500.

b) If the I-526 petition denial is due to factors not within the investor's control:

If the I-526 petition is denied due to factors that are not within his/her control, the Project will refund the US$ 500,000 capital investment and the US$ 50,000 processing fee to the investor for a total refund of US$ 550,000.

(2) When the investor's I-526 petition is approved, but he/she fails to receive the immigrant visa, his/her capital investment and processing fee shall be refunded as follows:

a) Refusal of the visa during the visa interview due to personal reasons:

If the investor fails the health examination, fails to obtain the Police Certificate, fails to provide any proof of the lawful source of his/her funds, fails to attend the interview per USCIS notice, withdraws the immigrant visa petition, or unable to get immigrant visa due to other factors within the control of the investor, the Project will refund the US$ 500,000 capital investment and US$ 37,500 of the processing fee (after deducting US$ 12,500) to the investor, for a total refund of US$ 537,500.

b) Refusal of the visa during the visa interview due to non-personal reasons:

If the visa is refused due to reasons that are not personal, the Project will refund US$ 500,000 capital investment and US$ 42,500 of the processing fee (after deducting US$ 7,500) to the investor, for a total refund of US$ 542,500.

6/11

Exhibit 16, Page 6 of 11

48.    The Refund Policy excepts from coverage other expenses and fees for services provided by immigration counsel and the foreign broker (i.e. Lianhong).

49.    The Refund Policy provides that the project shall refund in full the $500,000 investment and a portion of the administrative fee after receipt of a written notice from the investor.

50.    The Refund Policy is signed by all Individual Defendants who controlled and operated LVEIRC.

51.    The Offering Memorandum prepared by Jacoby, at p.18, excerpts conditions for a full refund of the investments and administrative fees from the detailed Refund Policy.

52.    The Refund Policy is affirmed in the September 2, 2015 Letter addressed to all investors and signed by Jacoby.

53.    On information and belief Defendants' promises of refund are false and misleading.  Defendants never intended to honor this Refund Policy.  Plaintiff is further informed and believes that Defendants never took action to establish a reserve account to fund their refund obligations.  Even if Defendants did take steps to establish a reserve account to fund their obligation to refund, Defendants breached their obligation of trust and confidence in managing funds in which Plaintiff retained an equitable and expectancy interest by prematurely causing or allowing funds to be dissipated, failing to plan and implement measures for a reserve account and refusing/failing to honor Plaintiff' refund requests.

54.    Alternatively, Defendants' representation of the Refund Policy is misleading because it partially suppresses, conceals or otherwise fails to exercise reasonable care by omitting the fact that there is no cash reserve to honor the Refund Policy.

55.    Pursuant to the Refund Policy, Plaintiff submitted a written refund request before a decision was rendered on her I-526 petition.

56.    Under the Refund Policy, Plaintiff is entitled to return of the full $500,000 and $42,500 of the administrative fee due to Plaintiff's voluntary withdrawal of her I-526 petition.

57.    More than 90 days have lapsed since Plaintiff submitted her written refund request.

58.    As of the date of this Complaint, Defendants have refused and/or failed to return $542,500 to Plaintiff.

**Value of Acquired Parcel**

59.    The Offering Memorandum stated that the land to be purchased is already zoned for resort casino and is presently owned by Sahara, a company held by LVEIRC's principals, Fonfa and Weidner.

60.    The Offering Memorandum stated that the first $22 million of the Offering proceeds will be applied to acquire the larger parcel of land.

61.    The Offering Memorandum further stated that the fair market value of this parcel owned by Fonfa/Weidner, through Sahara, was $21.7 million as of May 12, 2011 based on an appraisal by George A. Smith and Company ("Smith Appraisal").

62.    According to September 16, 2012 Appraisal Report prepared for Fonfa by Roger D. Duvardo ("Duvardo Appraisal"), the Sahara parcel had a value of $30.2 million, or over $8 million more than the Smith Appraisal.

63.    The Investment Summary similarly stated that "land appreciation based on [Duvardo] appraisal" is $8.2 million.

64.    The $30.2 million valuation, including the over $8million in "land appreciation," is grossly and vastly overstated.

65.    The Duvardo Appraisal is expressly based on the Smith Appraisal, and appraised a total of 108,290 square feet of "vacant land" located off-strip towards the far north end of Las Vegas Boulevard.  Property records indicate that the three parcels making up the approximate 108,000 sq. ft. vacant lot (162-04-807-004, 162-04-811-028, 162-04-814-002) was acquired by Sahara for less than $5 million.

66.    Defendants, through the Offering Memorandum, Duvardo Appraisal and Investment Summary, made or caused to be made false and misleading statements of material fact as to the value of the 108,000 sq. ft. parcel.

**Value Contributed by Fonfa/Weidner**

67.    The Offering Memorandum stated that LVEIRC's principals have acquired an adjacent parcel of land that will be crucial to the project's overall development plan.

68.    The Offering Memorandum stated that this 10,000 sq. ft. parcel of land is presently owned by Lucky Dragon Property, LLC, a Nevada limited liability company co-owned by the principals.

69.    The Offering Memorandum promised that this 10,000 sq. ft. parcel will be transferred to the LP as the LVEIRC's initial capital contribution.

70.    The Investment Summary stated that the "cost expended on purchasing neighboring land" to be $2,500,000.

71.    These statements of fact and promises are materially false and misleading, as there is no registered Nevada limited liability company named "Lucky Dragon Property, LLC" and the $2.5 million valuation is grossly and vastly overstated.

72.    Additionally, besides the three parcels referenced under paragraph 71, the Quitclaim Deed lists one other parcel (162-04-807-005) assigned by Sahara, not the non-existent company known as "Lucky Dragon Property, LLC."

73.    Through the Offering Memorandum and Investment Summary, Individual Defendants made or caused to be made false and misleading statement/promise of value contributed by LVEIRC's principals.

74.    Alternatively, assuming that the Offering Memorandum erroneously stated "Lucky Dragon Property" instead of Sahara, and its assignment of the 162-04-807-005 parcel as contribution by LVEIRC, the $2.5 million valuation is grossly and vastly overstated.

75.    Property records show that the vacant land was sold for $2,500 in 2004 and 2007.  In 2004, Fonfa and nonparties, Fifield and Maddocks, purchased this parcel to develop Allure Towers.  On May 14, 2004, Fonfa, individually, acquired title to this parcel described by APN#162-04-807-005.  The Declaration of Value attached to the 2004 Grant Bargain Sale Deed transferring title to Fonfa states the "Total Value/Sales Price of Property" as $2,500.00.  On March 12, 2007, title was transferred to Sahara Investments, LLC by Fonfa via a Grant,

Bargain, and Sale Deed, recorded as Instrument 20070314-0000598.  The Declaration of Value attached to the 2007 Grant, Bargain, Sale Deed transferring title to Sahara again states the "Total Value/Sales Price of Property" as $2,500.00.

76.    Defendants, through the Offering Memorandum and Investment Summary, made or caused to be made false and misleading statements of material fact as to the fact of contribution and/or value of the additional parcel contributed by LVEIRC's principals.

**Reserve Account Policy**

77.    The Investment Summary stated that Sahara pledges land sale proceeds of $22 million will be held in a designated account to demonstrate LVEIRC's determination to complete the project, and will commission an attorney licensed in China to monitor the account periodically.

78.    The Investment Summary described these pledged funds as contribution by LVEIRC.

79.    The Investment Summary stated that $11 million of the $22 million will be released only after the project has operated for four years and all investors have received distribution upon liquidation sale or refinance.

80.    $11 million should have been withheld by LVEIRC from Sahara, and presently available for honoring refund requests.

81.    Defendants' promises of withholding $11 million in purchase price and establishing the reserve account are false and misleading.  Defendants never intended to honor this Reserve Account.  Defendants never took action to establish this Reserve Account to hold funds, including $11 million that should still be available, as neither condition to release has been met.

82.    The project operated for less than four years.

83.    None of the investors in the project have received distribution upon liquidation sale or refinance.

84.    Even if Defendants did take steps to establish a reserve account to fund their refund  obligations, Defendants breached their obligation of trust and confidence in managing

1  funds in which Plaintiff retained an equitable and expectancy interest by prematurely causing or

2  allowing funds to be released to Sahara for their own personal benefit and gain.

3  **<u>Unauthorized Secured Credit Facility</u>**

4  85.    The Offering Memorandum stated that the LP, as offeror, is a Nevada limited

5  partnership.

6  86.    The USCIS Approved Limited Partnership Agreement for the Offeror states that

7  the partnership is governed by NRS Chapter 88, Nevada's Uniform Limited Partnership Act.

8  87.    NRS 88.455(1) incorporates limits on a general partner's powers under general

9  partnership statute (i.e. Chapter 87); providing that a general partner of a limited partnership is

10  subject to the restrictions of a partner in a partnership without limited partners.

11  88.    NRS 87.090(3) provides that a general partner has no authority, without the

12  consent of all general and limited partners, to assign the partnership property in trust for

13  creditors.

14  89.    Defendants' statement that NRS Chapter 88 applies to the partnership is

15  materially false or misleading.  In fact, Defendants elected for the LP to be governed by NRS

16  Chapter 87A instead of Chapter 88.

17  90.    In contrast to NRS Chapter 88, NRS Chapter 87A does not require consent of all

18  limited partners.

19  91.    Despite obtaining $89,500,000 in EB-5 investment and $8,950,000 in

20  "administrative fees," in or around May 2016, Defendants capitalized on their false statements,

21  and the EB-5 proceeds raised using such false statements, to secure a loan in the amount of

22  $45,000,000 from Snow Covered Capital, LLC ("SCC") without limited partners' approval.

23  92.    SCC relied on the EB-5 commitment in lending.  Pursuant to SCC's

24  Construction Loan Agreement, "No less than once each quarter, [LP] shall advise Lender in

25  writing of the then-current amount of Additional EB-5 Funds which are either available,

26  committed or pledged to [LP] for purposes of Project. As of the date hereof, the Additional EB-

27  5 Funds are $68,535,704."

28

93.    To secure the SCC Loan, Mr. Fonfa executed, on or about April 29, 2016, a Deed of Trust (With Assignment of Lease and Rents, Security Agreement and Fixture Filing) ("Deed of Trust"). Said Deed of Trust was recorded against title to the consolidated parcel identified by Assessor Parcel Number 162-04-816-001 in the official records of Clark County, Nevada Recorder's Office as Instrument Number 2016511-0002786.

94.    On September 1, 2017, SCC recorded a Notice of Default with the Clark County, Nevada under its Deed of Trust.

95.    On January 9, 2018, SCC recorded a Notice of Sale, scheduling the sale of the Project's land and buildings to take place on February 6, 2018. SCC subsequently postponed the scheduled trustee's sale until February 22, 2018.

96.    To stall the SCC foreclosure, on February 16, 2018, LVEIRC retained the law firm of Schwartz Flansburg PLLC to file a voluntary petition for Chapter 11 bankruptcy protection on behalf of the Operating LLC.

97.    Thereafter, on February 21, 2018, a second voluntary petition for Chapter 11 bankruptcy protection was filed for the LP.

98.    As part of the Schedules filed in these Chapter 11 bankruptcies, the EB-5 Investors, including Plaintiff herein, learned, for the first time, that the Project has been operated through the Operating LLC from its opening in or around November 2016; that their collateral has been significantly impaired by a secured Construction Loan in favor of SCC; that LP defaulted under the SCC secured Construction Loan; and  (contrary to the offering materials) that  LP essentially operates as a Landlord/Lender rather than the operator of the Project through various undisclosed, unauthorized leases, licensing agreements and promissory notes between and among the LP, Operating LLC, Eastern, Bofu, and LVEIRC.

99.    On September 25, 2018, the Bankruptcy Court presiding over these Chapter 11 bankruptcies entered an Order for Relief from Stay in favor of SCC to allow SCC to exercise all of its rights and remedies against LP's properties securing the SCC Construction Loan.

100.    SCC proceeded to record a new Notice of Sale, scheduling the sale of the Project's land and buildings to take place on October 30, 2018.

101. Pursuant to a Trustee's Deed Upon Sale ("TDUS"), SCC acquired title to the Project's land and buildings by credit bid in the amount of $35,000,000 at the foreclosure sale conducted on or about October 30, 2018.

102. The TDUS states that "amount of unpaid debt was $55,075,000 **(not including interest, costs and attorneys' fees)**" or more than $10,000,000 in excess of the face value of the Construction Loan at the time of the SCC Sale.

103. Construction of the Project commenced in April 2015 and the Project opened in November 2016. The original construction budget was $109,000,000 (excluding $6,000,000 in operating budget) but (according to filings prepared by Fonfa and LVEIRC in the Chapter 11 Bankruptcies) by the time the Project was completed, the budget had ballooned to over $160,000,000, an increase of 46.7 percent from the initial budget.

104. The Project's bankruptcies and sale of the Project assets created great uncertainty. These events could result in a "material change" in the Business Plan submitted to USCIS, and Plaintiff would be unable to show that she sustained her investment and created the necessary jobs.

105. Plaintiff, who has not received his conditional Green Card, is entitled to a full refund of the project investment and a majority, if not all, of the "administrative fee," pursuant to the parties' contractual agreements.

***Defendants Acted Knowingly or With Reckless Disregard of the Truth***

106. Defendants falsely promised in the offering materials that investors would be entitled to a range of refund, including the full amount of their investment ($500,000) and a majority of the "administrative fee" ($50,000), if Plaintiff withdraws her immigration application before obtaining their EB-5 visa. As alleged, Defendants did not intend to perform this promise at the time it was made.

107. Defendants knowingly, or with reckless disregard for the truth, stated in offering materials that the value of land sold or contributed to the LP is valued at over $30 million or $2.5 million, respectively.

108.    Defendants falsely promised in the offering materials that at least $11 million would be available until the project has been operating for four years and investors receive distribution from sale/refinance.  As alleged, Defendants did not intend to perform this promise at the time it was made.

109.    Defendants knowingly, or with reckless disregard for the truth, stated in offering materials that the partnership would be governed by NRS Chapter 88 and limited partners would be entitled to notice and approval of any secured loan obtained by the LP.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against All Defendants except Sahara)

110.    Plaintiff incorporates and re-alleges all previous paragraphs as if fully set forth herein.

111.    As alleged above, a valid contract (Refund Policy) exists between Plaintiff and Defendants under which Defendants promised to Plaintiff that the latter would receive a refund in the event of withdrawal so long as the withdrawal occurs before obtaining the EB-5 visa.

112.    Plaintiff complied by giving notice of withdrawal and request for refund in accordance with the contract.

113.    Defendants breached by refusing or failing to refund the Plaintiff all of her capital investment ($500,000) and the majority of his "administrative fee" ($42,500).

114.    As a result of Defendants' breaches, Plaintiff has suffered damages in excess of $75,000.

## SECOND CAUSE OF ACTION

### Breach of Good Faith and Fair Dealing (Contract/Tort)

### (Against All Defendants except Sahara)

115.    Plaintiff incorporates and re-alleges all previous paragraphs as if fully set forth herein.

116.    As alleged above, valid contract exists between Plaintiff and Defendants under which Defendants made promises to Plaintiff regarding the nature, value and risk inherent in the

equity interest in the LP marketed to the EB-5 Investors.

117.    As with every Nevada contract, an implied covenant of good faith and fair dealing exists in the contract between Plaintiff and Defendants, which essentially forbids arbitrary, unfair acts by Defendants which disadvantage the Plaintiff.

118.    As alleged above, Plaintiff and Defendants also share a special relationship of confidence and trust in which Plaintiff relied upon the Defendants to establish and maintain a reserve account to honor the Refund Policy and in accordance with the Reserve Policy.

119.    Plaintiff additionally relied upon Defendants to conduct purchases, construction, and operations of the Project in a manner conforming to requirements of immigration law so as to allow Plaintiff to acquire her conditional and permanent residency status under the EB-5 Visa Program.

120.    Plaintiff withdrew her I-526 petition and is entitled to a refund, which Defendants have not provided.

121.    Defendants failed to perform their promises in a manner that is faithful to the purpose of the contracts and in conformity to the justified expectations of the Plaintiff.

122.    As a result of Defendants' breaches, Plaintiff has suffered damages in excess of $75,000.

## THIRD CAUSE OF ACTION

### Intentional Misrepresentation

### (Against All Defendants, except Sahara)

123.    Plaintiff incorporates and re-alleges all previous paragraphs as if fully set forth herein.

124.    By engaging in the conduct alleged above, Defendants, in the offer and sale of securities, by the use of means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

125.    As detailed above, Defendants intentionally or recklessly made the untrue statements regarding 1) the value of land sold or contributed to the LP; 2) the limited partners'

right to approve granting any security interest in partnership property; and (3) engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

126. Plaintiff was unaware of the falsity of these representations, and relied on the truth of these representations in subscribing to a limited partner interest in the LP.

127. Plaintiff was justified in relying upon the representations based on, without limit, the following factors:

a. Plaintiff lacks experience, knowledge and/or familiarity in corporate governance, real property values, contracts;

b. Plaintiff lacks experience, knowledge and/or familiarity with U.S. law, regulation, business customs, business practices;

c. Plaintiff lacks reasonable access to reliable public records, other publicly-available information, or other sources of information to verify the truth of matters stated in offering materials;

d. The Offering materials disclosed that EB-5 funding and LVEIRC contribution would cover all funding needs for the project and did not disclose the need for additional third-party funding, let alone secured financing;

e. Plaintiff was counseled by immigration attorneys, similar to Global Law Group, that were appointed, controlled and compensated by Defendants;

f. Plaintiff was presented with a "safety net" in the form of Defendants' refund policy;

g. Plaintiff has had no knowledge, understanding or disclosure from Defendants regarding the existence, significance and/or risks associated with allowing common stakeholders and controlled persons to oversee and manage the affairs of the Project, the financing of the Project, the revenue/expenses of operating the Project, and all aspects of the Project that bear upon Plaintiff' ability to profit from or recover their investment.

h. The representation or promise played a substantial and material part in influencing the Plaintiff to invest in the project.

i.    No facts surrounding the investment served as a danger signal indicating a falsehood to Plaintiff, given the attributes and circumstances shaping his intelligence and experience.

128.    As a result of Defendants' intentional or reckless misstatements and half-truths, Plaintiff is entitled to judgment rescinding the investment contracts and for restitution of her capital investment and administrative fees.

129.    Because Defendants acted maliciously, oppressively and/or fraudulently in making material misstatements and half-truths in targeting and extorting hundreds of thousands of dollars capital investment and administrative fee from Plaintiff, punitive damages should be awarded to punish and deter Defendants from repeating their deceitful conduct/omission alleged herein.

## FOURTH CAUSE OF ACTION

### False Promise

### (Against All Defendants, except Sahara)

130.    Plaintiff incorporates and re-alleges all previous paragraphs as if fully set forth herein.

131.    By engaging in the conduct alleged above, Defendants, in the offer and sale of securities, by the use of means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

132.    As detailed above, Defendants intentionally made the false promises regarding 1) Defendants' ability and intent to honor the Refund Policy; 2) Defendants' intent to honor the Reserve Account Policy; and (3) engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

133.    Plaintiff was unaware of Defendants' intention not to perform the promises, and relied on the promises in subscribing to limited partner interests in the LP.

134.    Plaintiff was justified in relying on the promises based on factors alleged above under paragraph 126.

135.    As a result of Defendants' intentional or reckless misstatements and half-truths, Plaintiff is entitled to judgment rescinding the investment contracts and for restitution of her capital investment and administrative fees.

136.    Because Defendants acted maliciously, oppressively and/or fraudulently in making material misstatements and half-truths in targeting and extorting hundreds of thousands of dollars capital investment and administrative fee from Plaintiff, punitive damages should be awarded to punish and deter Defendants from repeating their deceitful conduct/omission alleged herein.

## FIFTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against All Defendants except Sahara)

137.    Plaintiff incorporates and re-alleges all previous paragraphs as if fully set forth herein.

138.    By engaging in the conduct alleged above, Defendants, in the offer and sale of securities, by the use of means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

139.    As detailed above, Defendants failed to exercise reasonable care or competence in communicating the untrue statements regarding 1) value of land sold or contributed to LP; 2) limited partners' right to approve granting of any security interest in partnership property.

140.    These false statements were supplied for the purpose of guiding Plaintiff in their decision to invest in the project.

141.    Plaintiff justifiably relied on the false information based on factors alleged above under paragraph 126.

142.    As a result of Defendants' intentional or reckless misstatements and half-truths, Plaintiff is entitled to judgment rescinding the investment contracts and for restitution of her capital investment and administrative fees.

**SIXTH CAUSE OF ACTION**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against All Defendants except Sahara)**

143.    Plaintiff incorporates and re-alleges all previous paragraphs as if fully set forth herein.

144.    By engaging in the conduct described above, Defendants, in connection with the sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud.

145.    Defendants engaged in acts, practices and courses of business which operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

146.    Defendants made untrue statements of material fact in the offering materials and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading.

147.    Defendants knew, or were reckless in not knowing, of the facts and circumstances described above.

148.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j (b); 17 C.F.R. § 240.10b-5].

**SEVENTH CAUSE OF ACTION**

**Civil Conspiracy**

**(Against All Defendants)**

149.    Plaintiff incorporates and re-alleges all previous paragraphs as if fully set forth herein.

150.    As detailed above, Defendants, by concerted action in the offer and sale of securities to Plaintiff, employed devices, schemes and artifices to defraud.

151.    Defendants induced Plaintiff to invest in the project with materially false or misleading statements or promises that Defendants did not intend to perform.

152.    Plaintiff suffered damages in investing in the project in reliance upon the false

1    statements of material facts and false promises.

2        153.    The Individual Defendants signed the Investment Summary and prepared the

3    various offering materials alleged above in which the false statements and promises were

4    contained.

5        154.    The Individual Defendants acted in concert by agreeing and/or executing the

6    fraudulent scheme alleged above to deprive Plaintiff of hundreds of thousands of dollars in

7    investment funds.

8                                **EIGHTH CAUSE OF ACTION**

9                                    **Declaration Relief**

10                                  **(Against All Defendants)**

11        155.    Plaintiff incorporates and re-alleges all previous paragraphs as if fully set forth

12    herein.

13        156.    An actual controversy exists between the parties as to the nature and extent of the

14    legal relationship and corresponding obligations, duties and responsibilities of the individual and

15    organizational Defendants.

16        157.    More specifically, a dispute has arisen between the parties in that individual

17    Defendants have misused or abused corporate form in order to extort unfair price and

18    compensation, conceal identities of common owners, and shift substantial business/economic

19    risk upon Plaintiff without prior notice and/or informed consent.

20        158.    The question of whether individual Defendants acted as alter ego of the

21    organizational Defendants is one that may be determined as a matter of law.

22        159.    On information and belief, the organizational Defendants are influenced and

23    governed by the individual Defendants.

24        160.    Plaintiff lack any interest, claim or right to influence or govern the organizational

25    Defendants.

26        161.    On information and belief, the organizational Defendants and individual

27    Defendants share such unity of interest and ownership that each is inseparable from the other.

28        162.    On information and belief, such a close unity of interest exists between the

Individual Defendants and the organizational Defendants because, without limitation:

    a.    Defendants have commingled funds and other assets, failed to segregate funds of the separate entities, and diverted funds or assets for the Project to other personal or corporate uses;

    b.    Defendants have treated the assets of the organizations as their own;

    c.    Defendants have failed to maintain minutes or adequate corporate records and/or confused the records of separate entities;

    d.    The organizational Defendants share identical equitable ownership, with the domination and control of the these entities exercised exclusively by the individual Defendants;

    e.    There is a common identity of members, managers and controlled persons of the organizational Defendants responsible for supervision and management, all of whom own all of the membership interests/economic rights, use the same office or business location, and use the same employees and/or attorneys;

    f.    Organizational Defendants lack adequate capitalization, have limited to no corporate assets, and are used merely as a shell, instrumentality, or conduit for a single venture or the business of the Individual Defendants;

    g.    Defendants concealed and/or misrepresented the identity of the seller of the land and the operator of the Project responsible;

    h.    The disregard of legal formalities and the failure to maintain arm's length relationships among related entities;

    i.    The diversion of assets to the Individual Defendants, the unauthorized manipulation of liabilities, the use of a corporate entity as a shield against personal liability, to the detriment of the Plaintiff;

163.    Adherence to the fiction of separate entity under these circumstances would sanction fraud and promote injustice.

164.    A declaration of rights, duties and obligations of the parties hereto is essential to determine the claims alleged by Plaintiff.

165.    Plaintiff is entitled to a determination from the Court, pursuant to NRS 30.010 and NRS 40.010, that the Parties' contractual refund policy entitles Plaintiff to a full refund as set forth therein.

166.    Plaintiff is further entitled to a determination from the Court, pursuant to NRS 30.010 and NRS 40.010, that the Organizational Defendants are mere alter ego in relations to the Developers used to shield the latter's wrongful and fraudulent conduct; that allowing the Developers to use the fiction of separate entities under these circumstances would sanction fraud and promote injustice; and that, to the extent the Organizational Defendants are liable to Plaintiff, the Individual Defendants shall be personally, jointly and severally liable for the damages awarded to Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against each Defendant, jointly and severally, as follows:

1.   For special/compensatory damages, according to proof;

2.   For a sworn accounting of all monies obtained from Plaintiff and under the Refund Policy, including disposition and current location of money, disclosure of all bank and brokerage accounts where they deposited the money;

3.   For restitution of all sums by which Defendants have been unjustly enriched;

4.   For costs of suit and attorney's fees, as recoverable by law;

5.   For punitive damages according to proof of fraudulent or malicious misconduct, as recoverable by law;

///

///

///

6.  For a declaration that  Developers are the alter ego of the organizational Defendants such that the Individual Defendants shall be personally, jointly and severally liable for the damages awarded to Plaintiff;

7.  For order imposing and enforcing constructive trust of property transferred by Defendants through their fraudulent scheme; and

8.  For such other and further relief as the Court deems just and proper.

DATED this 17th day of August, 2020.

WRIGHT, FINLAY & ZAK, LLP

*/s/ Yanxiong Li, Esq.*
Charles C. McKenna, Esq.
California Bar No. 167169 (*PHV petition* forthcoming)
Lukasz I. Wozniak, Esq.
Nevada Bar No. 12139
Yanxiong Li, Esq.
Nevada Bar No. 12807
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
*Attorneys for Plaintiff, Kaiqing Yang*

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury of all issues so triable under the law.

DATED this 17th day of August, 2020.

WRIGHT, FINLAY & ZAK, LLP

*/s/ Yanxiong Li, Esq.*
Charles C. McKenna, Esq.
California Bar No. 167169 (PHV petition forthcoming)
Lukasz I. Wozniak, Esq.
Nevada Bar No. 12139Yanxiong Li, Esq.
Nevada Bar No. 12807
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
*Attorneys for Plaintiff, Kaiping Yang*