UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| KAIQING YANG, *et al.*, | Case No. 2:20-cv-01518-KJD-EJY |
| Plaintiffs, | ORDER |
| v. | |
| WILLIAM WEIDNER, *et al.*, | |
| Defendants. | |

Presently before the Court is Defendants BOFU, LLC, David Jacoby, Sahara Investments LLC, William Weidner, and Weidner Management, LLC's Motion to Dismiss (#61). Defendant Las Vegas Economic Impact Regional Center, LLC's also filed a Motion to Dismiss and Joinder (#63). Plaintiff filed an Omnibus Opposition (#69/70) in response to which Defendants replied (#72/72/73/74/76).

I. Background

A. Allegations of the Complaint

In 2015, Plaintiffs, Chinese nationals, each invested $500,000 (plus a $50,000 processing fee) into LD LP through Las Vegas Economic Impact Regional Center ("LVEIRC"), a USCIS approved Regional Center. Regional Centers may streamline the EB-5 process by obtaining pre-approval from USCIS that a project will meet EB5's requirements.

Under the EB-5 program, 8 U.S.C. § 203(b)(5), foreign nationals who invested $500,000 into a targeted employment area that creates at least 10 qualifying jobs (and meet other criteria) are eligible to receive Green Cards so long as their investment is "at risk." The "at risk" component is crucial to ensure that it is a bona-fide investment.

EB-5 investors file a Form I-526 Petition with USCIS to become eligible to apply for conditional Green Cards. Investors must show that they invested the required amount of capital,

the capital is "at risk," the capital was obtained through lawful means, their investment will create the requisite number of jobs, and they will be engaged in the management of the new commercial enterprise. It can take years for investors to receive conditional Green Cards, even after approval of their I-526 Petition. Ninety days before the two-year anniversary of receiving their conditional Green Cards, investors can file I-829 Petitions which, when granted, convert their conditional Green Cards to permanent Green Cards.

Beginning in 2012, Defendants, all of whom are officers of Defendant LVEIRC[1], began marketing opportunities for Chinese nationals, including Plaintiffs, to invest in a project to build a hotel and casino in Las Vegas named the Lucky Dragon (the "Project"). The purpose of targeting foreigners was to take advantage of the immigrant EB-5 program. LVEIRC was a sponsor of the program and marketed investment in the Project primarily as a vehicle for investors to obtain residence and strong returns on investment. (Id. at ¶ 1).

In November and September 2015, Plaintiffs each invested $500,000.00 in capital contributions and $50,000.00 in administrative fees to the Lucky Dragon Limited Partnership ("LP"), which Defendants created to pool investments for the Project. (Id. at ¶¶ 15, 16, 36). LVEIRC was the general partner of the LP, and it brought EB-5 investors in as limited partners. (Id. at ¶ 36). The Project was a failure, and the LP filed Chapter 11 bankruptcy in 2018, before either Plaintiff had received an EB-5 visa. (Id. at ¶¶ 15, 16, 99). As a result, neither investor was able to obtain a visa or any return on their investment.

Before Plaintiffs first made their capital contributions, Defendants provided them with a 434-page booklet entitled "Lucky Dragon Subscription Agreement", which contained a number of documents that, together, constitute the agreement between the parties (the "Subscription Agreement").[2] (Id. at ¶ 35). The first substantial document within the Subscription Agreement is

---

[1] Fonfa, who has since passed away, was an owner and manager of LVEIRC and held his interest through Eastern Investments, LLC. His co-owner and manager, Weidner, held his interest in LVEIRC through Weidner Management, LLC which, in turn, held its interest through BOFU, LLC. Jacoby acts as LVEIRC's managing director. (See, ECF 22 at ¶ 7).

[2] A copy of the cover page and table of contents of the Subscription Agreement are attached as Exhibit 1 to Plaintiffs' Omnibus Opposition (#70) to Defendants' motions to dismiss. The cover page reads, "Lucky Dragon Subscription Agreement" in Chinese only.

the Investment Summary, located right after the Table of Contents and a two-page Confidentiality Agreement. The Investment Summary is signed by each individual Defendant under the titles of the various entity Defendants, and it states the most important terms of the overall agreement between the parties. (Id. at ¶¶ 48-51). It continually references the various rights and responsibilities of the parties, and it explicitly states that LVEIRC "promises" to take multiple actions. Defendants created the Investment Summary in January 2013, well after every other document in the Subscription Agreement, and it references each of those documents by name. (Amended Complaint ¶ 2). Defendants' motions to dismiss claim the Investment Summary was not actually a part of the controlling documents of this case. To them, only certain other documents in the Subscription Agreement control the terms of the agreement between the parties.

Some of the other Subscription Agreement documents are mentioned in the Amended Complaint, such as the Confidential Private Offering Memorandum (the "Offering Memorandum"), an appraisal report prepared by Roger D. Duvardo (the "Duvardo Appraisal"), and the Limited Partnership Agreement of Lucky Dragon, LP (the "Partnership Agreement"). (Id. at ¶ 35). Apart from those documents, the Subscription Agreement contains another document also confusingly titled, "the Subscription Agreement" (referred herein as the "Component Agreement" to avoid confusion).[3] The Amended Complaint makes no mention of the Component Agreement, but Defendants rely heavily on the document in their motions.

Plaintiffs allege that because it is so difficult to obtain permanent residency status through the EB-5 program, Defendants went to great effort to induce Plaintiffs to invest in the Project by guaranteeing that Plaintiffs would receive a refund of their investment if they were unable to obtain an I-526 approval or an EB-5 visa.

The Investment Summary contains a detailed policy allowing investors to receive a refund of most, if not all, of their investment if their I-526 petition or their visa application is not approved for any reason (the "Refund Policy"). Specifically, it states:

---

[3] In their motions, Defendants refer to the Component Agreement as the "Subscription Agreement", because they do not agree that the Subscription Agreement booklet is a contract. They only accept what Plaintiffs refer to as the Component Agreement as the subscription agreement (as it is titled).

>2.8 The US$ 500,000 capital investment and the US$ 50,000 processing fee paid by the investor in accordance with the subscription agreement shall be returned to the investor if his/her 1-526 petition is denied or he/she fails the interview. The refund arrangements are as follows:
>
>(1) When the investor's I-526 petition is denied, his/her capital contribution and processing fee shall be refunded in the following manner:
>
>>a) If the I-526 petition denial is due to factors within the investor's control: If the investor withdraws the I-526 petition, provides false data/information, fails to perform in accordance with the subscription agreement, or refuses to cooperate in the filing and handling of the I-526 petition in such a way as to result in the withdrawal or denial of the I-526 petition, the Project will refund the US$ 500,000 capital investment to the investor, and will refund US$ 42,500 of the processing fee (after deducting US$ 7,500) to the investor for a total refund of US$ 542,500
>
>. . . .
>
>(2) When the investor's I-526 petition is approved, but he/she fails to receive the immigrant visa, his/her capital investment and processing fee shall be refunded as follows:
>
>>a) Refusal of the visa during the visa interview due to personal reasons:
>>
>>>If the investor fails the health examination, fails to obtain the Police Certificate, fails to provide any proof of the lawful source of his/her funds, fails to attend the interview per users notice, withdraws the immigrant visa petition, or unable to get immigrant visa due to other factors within the control of the investor, the Project will refund the US$ 500,000 capital investment and US$ 37,500 of the processing fee (after deducting US$ 12,500) to the investor, for a total refund of US$ 537,500.
>>
>>b) Refusal of the visa during the visa interview due to non-personal reasons:
>>
>>>If the visa is refused due to reasons that are not personal, the Project will refund US$ 500,000 capital investment and US$ 42,500 of the processing fee (after deducting US$ 7,500) to the investor, for a total refund of US$ 542,500. (Exhibit 2, Section 2.8).

The Investment Summary goes on to state that "[t]he Project shall refund [the money] . . . within 90 days after receipt of a written notice."

Such policies were common for EB-5 programs, (Amended Complaint ¶ 29), and

- 4 -

Defendants sent communications to Plaintiffs promoting the policy. In September 2015—more than two years after Defendants created the Subscription Agreement, and at the same time Plaintiffs invested in the Project—Defendant Jacoby, on behalf of LVEIRC, sent a letter to all investors responding to a request "for clarification of a few key issues" (the "Jacoby Letter). (¶ 44). The Jacoby Letter explicitly confirms, "[Defendants'] detailed Refund Policy is outlined in Section 2.8 of the Investment Summary." The Letter further clarifies how Defendants would make repayments where it states:

> The founders of [LVEIRC] are independently personally wealthy. Their combined net worth is well over $200 million, and they could easily pay back all EB-5 investors if needed."

Despite the detailed promise of a refund, Defendants have refused and, it is alleged, never intended to honor their Refund Policy. When the LP filed bankruptcy, Plaintiff Yang had not even had her initial I-526 application granted to place her in the EB-5 program. Since the bankruptcy constituted a material change in the Project, it appeared highly unlikely that Yang's application would ever be approved, so, relying on the Refund Policy and the Jacoby Letter, Yang withdrew her application and provided Defendants with a notice of withdrawal, expecting a refund of $542,500.00 pursuant to Section 2.8(1)(a) of the Investment Summary. (Amended Complaint at ¶¶ 15, 105). Similarly, while Plaintiff Pan's I-526 application was approved, she never received a EB-5 visa and passed away in 2019. Pursuant to Section 2.8(2)(b) of the Investment Summary, Pan's estate provided notice and expected a refund of $542,500.00. Defendants refused to provide either refund and now claim that the Refund Policy was not an enforceable term of the agreement between the parties. (¶ 15, 16).

Defendants also made a number of other misrepresentations that affected Plaintiffs' ability to obtain a refund. They falsely represented 1) the value of land they purchased from Defendant Sahara Investments, LLC, a company they owned and operated; 2) that the money the LP used to purchase that land would not be released to Defendants until the Project had operated for four years and investors had received distributions; and 3) that the LP would not receive financing outside the EB-5 program and would not assign the LP's property to a creditor. (Amended Complaint ¶¶ 60-110).

Plaintiffs then officially sought refunds, were denied, and then filed the present action for breach of contract, misrepresentation, false promise, negligent misrepresentation, violation of section 10(b) of the Exchange Act and civil conspiracy. Defendants have now moved to dismiss each claim.

II. Standard for a Motion to Dismiss

Under Rule 8, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. C IV. P. 8(a)(2). A complaint does not require "detailed factual allegations," but "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Co. v. Twombly, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557). All "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. While the court "must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). "When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed." Hendon v. Geico Ins. Agency, 377 F.Supp.3d 1194, 1196 (D. Nev. 2019).

III. Analysis

A. Breach of Contract

To state a claim for breach of contract in Nevada, a plaintiff must demonstrate: (1) the existence of a valid contract; (2) that plaintiff performed or was excused from performance; (3) that the defendant breached the contract; and (4) that the plaintiff sustained damages. Calloway v. City of Reno, 993 P.2d 1259, 1263 (2000). Interpreting an unambiguous contract is generally a question of law. Galardi v. Naples Polaris, LLC, 301 P.3d 364, 366 (2013).

Defendants argue that the clear language of the Component Agreement incorporates the Offering Memorandum, the Escrow Agreement and the Limited Partnership Agreement only. However, the problem with Defendants' argument is that the Limited Partnership Agreement, in

- 6 -

an attempted integration clause, states the contract is the Partnership Agreement and "any other documents executed by the Partners contemporaneously with the execution of this Agreement[.]" Granting a motion to dismiss before discovery would normally be premature, especially given the alleged 434-page packet, titled "Subscription Agreement" in Chinese, prepared by Defendants and containing promises to refund the Investment. However, Defendant correctly asserts that Plaintiffs never alleged that they read and relied on that document. That is particularly essential, since Plaintiff Pan cannot have relied on the Jacoby Letter, because it was written after Pan signed the Subscription Agreement. Therefore, the Court grants Defendant's motion to dismiss the breach of contract and breach of the covenant of good faith and fair dealing claims with leave to amend.

### B. Intentional Misrepresentation/False Promise

In order to state a claim for intentional misrepresentation, a plaintiff must allege: (1) A false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation. Barmettler v. Reno Air, Inc., 956 P.2d 1382, 1386 (1998). Plaintiffs must have "justifiably relied on the representation," Epperson v. Roloff, 719 P.2d 799, 802 (1986), and "[t]he false representation must have played a material and substantial part in leading the plaintiff to adopt his particular course." Lubbe v. Barba, 540 P.2d 115, 118 (1975).

Again, the Court agrees that Plaintiffs may have alleged an adequate claim for misrepresentation based on the documents in the 434-page "Subscription Agreement". However, Plaintiffs must have justifiably relied on the documents. They cannot have justifiably relied on them if they had not read them. Accordingly, the Court grants the motion to dismiss this claim for lack of factual allegation that Plaintiffs read and relied on the documents. However, the Court grants Plaintiffs leave to amend.

### C. Violation of Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the 1934 Act makes it unlawful to "use or employ, in connection with

the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." SEC Rule 10b-5, which implements Section 10(b), requires fraud or misrepresentation in connection with the purchase or sale of securities. The Court agrees with Defendants that Plaintiffs allegations on this claim are completely lacking the detail required to state a claim. Plaintiffs have neither alleged which statements were made by which Defendants nor pleaded with particularity as required by Rule 9(b). Additionally, Plaintiffs have not adequately alleged facts to support the necessary scienter. Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 987 (9th Cir. 2009) (affirming dismissal of the complaint with prejudice where plaintiff failed to adequately plead a strong inference of scienter). To adequately plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. at 991. Accordingly, the Court grants the motion to dismiss this claim with leave to amend.

### D. Civil Conspiracy

Civil conspiracy requires a concert of action with the intent to accomplish an unlawful objective for the purpose of harming another, commission of an unlawful act, causation and damages. McDonald v Palacios, 2016 WL 5346067 (D. Nev. 2016), aff'd, 710 Fed.Appx. 318 (9th Cir. 2018). Plaintiffs allege only the most conclusory assertions of fraud and conspiracy. Accordingly, the Court dismisses this claim with leave to amend.

### E. Statute of Limitations

The three-year statute of limitations for actions based in fraud or misrepresentation begins to accrue on the discovery of facts constituting the fraud. See Nev. Rev. Stat. 11.190(3)(d); Kancilia v. Claymore and Dirk Ltd. P'ship, 130 Nev. 1203 (Nev. 2014). Plaintiffs' requests for a refund were not denied until 2020. Accordingly, the claims are timely having accrued in the same year the complaint was filed.

### F. Alter Ego

Defendants argue that Plaintiffs have not alleged sufficient facts to state claims against Defendants in an alter ego capacity.  An alter ego showing in Nevada requires that (1) the entity is "influenced and governed by" the member; (2) there is "such unity of interest and ownership"

that the entity and the member are inseparable from each other; and (3) adherence to the fiction of a separate entity "would, under the circumstances, sanction a fraud or promote a manifest injustice." Truck Ins. Exch. v. Palmer J. Swanson, Inc., 189 P.3d 656, 660 (Nev. 2008) (quoting Ecklund v. Nevada Wholesale Lumber Co., 562 P.2d 479, 479-80 (Nev. 1977)); NRS 78.747. Although "there is no litmus test for determining when the corporate fiction should be disregarded," factors indicating the existence of an alter ego include: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities. Polaris Indus. Corp. v. Kaplan, 747 P.2d 884, 887 (Nev. 1987).

Plaintiffs' factual allegations in the complaint are more than enough to meet the standard. Detailed financial evidence would be unlikely to be in Plaintiffs' hands. However, a review of the documents referenced in the Amended Complaint provide ample evidence from which a fact finder could conclude that the corporate entities were alter egos. The Investment Summary continually references the LP, LVEIRC, the individual Defendants, and the entity Defendants interchangeably as do the other documents. For example, the Offering Memorandum continually refers to Weidner and Fonfa as the principals of LVEIRC even though their single-member LLCs are the actual principals. The Offering Memorandum further states that the individual Defendants Fonfa and Weidner are the only two owners of LVEIRC and that the property they personally own through another entity would constitute LVEIRC's contribution to the LP. Similarly, the Jacoby Letter blurs the line between the assets of LVEIRC and of LVEIRC's "founders" in claiming that the personal wealth of the individuals would be available to refund or repay investors. Between the contents of the documents referenced in the Amended Complaint and the allegations contained therein, Plaintiffs have more than sufficiently alleged that Defendants are alter egos of either the LLC's or corporations or that the LLCs are alter egos of the corporations. In Nevada, the alter ego doctrine applies to LLCs. See Gardner v. Eighth Judicial Dist. Court, 405 P.3d 651, 656 (Nev. 2017).

IV. Conclusion

Accordingly, IT IS HEREBY ORDERED that Defendants BOFU, LLC, David Jacoby,

Sahara Investments LLC, William Weidner, Weidner Management, LLC's Motion to Dismiss (#61) is **GRANTED in part and DENIED in part**;

    IT IS FURTHER ORDERED that Defendant Las Vegas Economic Impact Regional Center, LLC's Motion to Dismiss (#63) is **GRANTED in part and DENIED in part**;

    IT IS FURTHER ORDERED that Plaintiffs file an amended complaint within twenty-one (21) days of the entry of this order, failure to do so will result in this action being dismissed.

Dated this 31st day of March, 2022.

                                        Kent J. Dawson
                                        United States District Judge